**In re FINE PAPER ANTITRUST LITIGATION.**

**M.D.L. No. 323.**

United States District Court,
E. D. Pennsylvania.

April 6, 1979.

144

Harold E. Kohn, Philadelphia, Pa., for plaintiff.

Patrick Kittredge, Elihu A. Greenhouse, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge:

This litigation presently consists of 37 antitrust actions (the "MDL 323 actions"), of which 4 were filed in this district originally and the remainder were transferred to this district by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407. *In re: Fine Paper Antitrust Litigation*, 446 F.Supp. 759 (Jud. Pan.Multi.Lit.1978).

The complaints in each action basically allege that defendants and various co-conspirators conspired to fix the prices of a line of products known as fine paper in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Each of the actions is brought under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), provisions authorizing suit by private parties injured by violations of the antitrust laws.

Plaintiffs in 34 of the 37 actions have sought certification of classes pursuant to Rule 23 Fed.R.Civ.P. Additionally, the Commonwealth of Massachusetts has filed a motion to proceed as a unitary plaintiff.

By order dated February 16, 1979, I denied the motions by the states of Alaska, Arizona, Arkansas, California, Colorado, Iowa, Louisiana, Missouri, Montana, Nebraska, New Mexico, Oregon, Pennsylvania, Utah and Washington (each a plaintiff in one of the actions before the court) for certification of state-wide classes consisting of local governmental units within each plaintiff's state. At the same time, the court certified classes in the actions listed below as follows:

a) *State of Connecticut v. Boise Cascade Corp., et al,* C.A. 78–1044. A class consisting of the state of Connecticut, all its cities, counties, and political subdivisions and all school districts, government universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977 purchased from any defendant, or any subsidiary or

affiliate thereof, any kind, type or grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

b) *State of Illinois v. Boise Cascade Corp., et al,* C.A. 78–905. A class consisting of the State of Illinois, all its cities, counties, and political subdivisions and all school districts, government universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977 purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

c) *State of Kansas v. Boise Cascade Corp., et al,* C.A. 78–1437. A class consisting of the State of Kansas, all its cities, counties, and political subdivisions and all school districts, government universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977 purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but

excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

d) *State of Minnesota v. Boise Cascade Corp., et al,* C.A. 78–1051. A class consisting of the State of Minnesota, all its cities, counties, and political subdivisions and all school districts, government universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977 purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

e) *State of South Dakota v. Boise Cascade Corp., et al,* C.A. 78–864. A class consisting of the State of South Dakota, all its cities, counties and political subdivisions and all school districts, government universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977 purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

f) Fourteen private plaintiffs' actions.[1] A class consisting of all persons, other

---

1. *Moses Jaroslawicz, etc. v. Boise Cascade Corp., et al* (C.A. 77–3183); *The Pengad Companies, Inc. v. Boise Cascade Corp., et al* (C.A. 77·3352); *Joli Greeting Card Co., Inc. v. Boise*

than governmental entities, in the United States, (excluding defendants and named co-conspirators in the MDL 323 actions, their respective subsidiaries and affiliates) which during the period January 1, 1965 to June 30, 1977, purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type of grade of fine paper (that is, all printing and writing papers listed on American Paper Institute Product Reference List under API Code Nos. 2621–200 to 2621–679, both inclusive, and including the prime coated body stock which is the subject of the exclusion note in No. 2621–330, but excluding cigarette, filter and condenser papers) or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

Finally, I denied the Motion of the Commonwealth of Massachusetts to Proceed as a Unitary Plaintiff in *Commonwealth of Massachusetts v. Boise Cascade Corp., et al* (C.A. 78–1295).

This Memorandum sets forth the basis for the rulings in my February 16th order.

## I. THE FINE PAPER INDUSTRY

Fine paper means and includes all printing and writing papers and all paper products into which such papers are converted, including coated and uncoated book, publication (excluding newsprint), printing and converting papers, offset papers, chemical writing papers (bond and writing, form bond, ledger, mimeograph, duplication and related papers), cotton content papers, cover and text papers, thin papers (excluding cigarette, condenser and filter papers), and bristols.

During the period 1965–1976, printing and writing papers accounted for between 46% and 49% of all paper shipments in the United States (American Paper Institute, *1976 & 1977 Statistics of Paper and Paperboard*, Table I). A considerable portion of printing and writing papers (other than newsprint) produced in this country is sold directly by fine paper manufacturers, or their subsidiaries or affiliates, to governmental entities and to business or commercial users, such as book and magazine publishers, commercial printers and lithographers, stationers, xerographic print shops and similar users (Guthrie, *An Economic Analysis of the Pulp and Paper Industry*, Washington State University Press 1972, p. 133). According to the 1972 Census of Wholesale Trade, of the total sales, at wholesale, of printing and writing papers, 44.4% was sold by fine paper manufacturers directly to business or commercial users (U.S. Department of Commerce, Bureau of Census, *1972 Census of Wholesale Trade*, Vol. I, Table 1 at pp. 4–6). A considerable volume of fine paper is also sold directly by fine paper manufacturers to wholesale paper merchants (merchant houses) and to converters to be made into tablets, stationery, envelopes and the like (*Guthrie, supra* at p. 133).

The fine paper manufacturers who are defendants in the MDL 323 actions account for 64% of the fine paper market (tonnage) in the United States (*1977 Lockwood's Directory of the Paper and Allied Trades*).

## II. THE CLASS CERTIFICATION MOTIONS

For purposes of analysis, the classes proposed in the MDL 323 actions may be grouped into three categories:

1. the 14 actions brought by private plaintiffs (private class actions);

Cascade Corp., et al (C.A. 78–171); *Campbell Office Supply Co. v. Boise Cascade Corp., et al* (C.A. 78–906); *Herst Litho, Inc. v. Boise Cascade Corp., et al* (C.A. 78–907); *Magazine Management Co., Inc. v. Boise Cascade Corp., et al* (C.A. 78–908); *William Grader v. Boise Cascade Corp., et al* (C.A. 78–972); *Copies Unlimited, Inc. v. Boise Cascade Corp., et al* (C.A. 78 973); *William Fels t/a Fels Printing v. Boise

Cascade Corp., et al (C.A. 78–1045); *Phillip Meroney, etc. v. Boise Cascade Corp., et al* (C.A. 78–1046); *Artcraft Press, Inc. v. Boise Cascade Corp., et al* (C.A. 78–1097); *Irving Kanter v. Boise Cascade Corp., et al* (C.A. 78–1169); *David Weis Wholesale Jewelers v. Boise Cascade Corp., et al* (C.A. 78–1170); *Archdiocese of Philadelphia v. Boise Cascade Corp., et al* (C.A. 78–1692).

2. the 5 actions brought by the states of Connecticut, Illinois, Kansas, Minnesota and South Dakota (the minority states' actions);

3. and the 15 actions brought by the states of Alaska, Arizona, Arkansas, California, Colorado, Iowa, Louisiana, Missouri, Montana, Nebraska, New Mexico, Oregon, Pennsylvania, Utah and Washington (the majority states' actions).

My discussion of the class action issues in the MDL 323 actions will proceed most efficiently by treating first the actions in which class certifications have been granted (the minority states' actions and the private class actions), and then the actions in which class certifications have been denied (the majority states' actions).

### A. Certification of the Private Class Actions and Minority States' Actions

The complaints in the private class actions and the minority states' actions contain essentially the same allegations of antitrust misconduct. In each complaint, the same 15 fine paper manufacturers and various co-conspirators, including subsidiaries and affiliates of defendant fine paper manufacturers, are charged with combining and conspiring to fix, raise, maintain and stabilize the prices of fine paper.

Plaintiffs in the private class actions and the minority states actions sought certification of their proposed classes under Rule 23(a) [2] and 23(b)(3) [3] of the Federal Rules of Civil Procedure. It is well settled that the parties seeking class action certification bear the burden of demonstrating that each of the requirements of Rule 23(a) and Rule 23(b)(3) have been satisfied. *McAdory v. Scientific Research Instruments, Inc.*, 355 F.Supp. 468 (D.Md.1973); *City of Philadelphia v. Emhart Corp.*, 50 F.R.D. 232 (E.D. Pa.1970).

A court, in making class action determination, does not have "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. . . ." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The inquiry is limited to whether or not the requirements of Rule 23 have been satisfied. *Miller v. Macky International, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971).

#### 1. Numerosity

To fulfill the numerosity requirement of Rule 23(a)(1), the plaintiffs must show that the proposed class is so numerous that joinder of all members is impracticable.

Defendants have not contended that the private class action plaintiffs have failed to satisfy the requirements of Rule 23(a)(1). Indeed, twelve defendants in these actions have deprecated the private plaintiffs' estimate of approximately 30,000 potential class members and have instead suggested that a more accurate estimate would con-

---

**2.** Rule 23(a) provides:

    (a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**3.** Rule 23(b)(3) provides:

    (b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

    .    .    .    .    .

    (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

tain more than 100,000 members.[4] There can be no serious question that joinder of either 30,000 or 100,000 widely dispersed parties would be impracticable.

Defendants do assert, however, that the minority state plaintiffs have failed to establish that the class sought by each plaintiff is so numerous that joinder of all members is impracticable. Defendants note that, as a general rule, only direct purchasers have standing to sue to recover for injuries under the antitrust laws. *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Defendants assert that, at best, the minority states' estimates of potential class members [5] only established the number of fine paper users among the local governmental units. Plaintiff states have not demonstrated, defendants urge, how many of the respective local governmental units have purchased fine paper directly from a defendant or alleged co-conspirator. Defendants contend that the actual number of direct purchasing class members is insufficient to satisfy the requirement of numerosity.

On the basis of the record before me, I concluded that the minority states met the requirements of Rule 23(a)(1). Mere allegations that the numerosity requirement has been met is not sufficient to satisfy the burden which is placed on the plaintiffs. *Mason v. Calgon Corp.*, 63 F.R.D. 98 (M.D.Pa.1974); *Al Barnett and Sons, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43 (D.Del.1974). But this court will not require each of the minority states to conduct a burdensome pre-certification survey of all potential class members in order to ascertain 1) the identity of each class member's suppliers, and 2) whether the purchases were direct purchases or otherwise treated as such pursuant to the exceptions permitted under the *Illinois Brick* ruling. *See Illinois Brick Co. v. State of Illinois, supra* at 739, 97 S.Ct. 2061.[6] Instead, the court has found that the sampling methodology adopted by the minority states is acceptable at this point, and that the samplings have preliminarily established the likelihood that at least thirty local governmental units in each of the minority states have purchased fine paper directly from a defendant or alleged co-conspirator.[7] If, at a later date, these estimates prove to be inaccurate, this court has the power under Rule 23(c) and (d) to make appropriate adjustments in the class certifications of the minority states actions.

Even if the exact size of the class is unknown, the numerosity prerequisite can be satisfied by a showing of the impracticability of joinder. *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 624 (E.D.Pa. 1976); *Wright and Miller, Federal Practice and Procedure*, § 1762 at 594 (1972). This does not mean that joinder is impossible but only that it would be difficult or inconvenient. *Union Pacific Railroad Company v. Woodahl*, 308 F.Supp. 1002, 1008 (D.Mont. 1970).

Joinder would be impracticable in each of the minority states' actions because many of the local government class members might not be able to assume the financial burdens associated with litigation of individual antitrust lawsuits, *see In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 732 (N.D.Ill.1977), and because many of the

---

4. Defendants' Joint Memorandum in Opposition to Plaintiffs' Motions for Class Certification (filed Oct. 20, 1978) pp. 14–15.

5. Plaintiffs estimate 421 class members in Connecticut; 6,643 in Illinois; 3,730 in Kansas; 1,452 in Minnesota; and 1,730 in South Dakota. Memorandum in Support of Plaintiffs' Motion for Certification of Classes, Exhibit B, p. 1 (filed May 22, 1978).

6. *See* Appendix to Reply on Behalf of Private Plaintiffs and Certain State Plaintiffs to Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion for Class Certification, Appendix C (filed Nov. 21, 1978); Transcript of Dec. 19, 1978 Hearing pp. 15, 16.

7. Any determination of the applicability of the *Illinois Brick* exceptions to the local governmental purchasers at this time would require an extensive inquiry into the merits of the minority states' actions, and such an inquiry at the time of initial class certification is not permissible. *Eisen v. Carlisle & Jacquelin, supra*, at 417 U.S. 177, 94 S.Ct. 2140.

members may have relatively small claims, rendering it unfeasible in an economic sense for them to bring their claims individually. *See In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa.1976). Additionally, there appears to be significant geographical distribution among the class members in each state which also makes joinder impracticable. *See Carr v. New York Stock Exchange, Inc.,* 414 F.Supp. 1292, 1304 (N.D.Cal.1976); *Campbell v. A. C. Petersen Farms, Inc.,* 69 F.R.D. 457, 465 (D.Conn.1975). Finally, as discussed *infra* pp. 19–20, the obstacles to judicial economy that would be generated by joinder of individual claimants has led this court to conclude that Rule 23(a)(1)'s criteria are met.

### 2. Commonality

■ As the court's discussion, *infra* p. 151–155, in connection with the requirements of Rule 23(b)(3) illustrates, there are common questions of law or fact among the private plaintiffs' actions and the minority states' actions. Each plaintiff will be required to establish the existence of a conspiracy to fix, raise, maintain and stabilize the price of fine paper. The existence, scope and efficacy of the alleged conspiracy are clearly questions that are common to all class members. *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 247 (S.D.Tex.1978). *In re Master Key Antitrust Litigation,* 70 F.R.D. 23, 26 (D.Conn.1975), *appeal dismissed,* 528 F.2d 5 (2d Cir. 1975).

### 3. Typicality

■ The court finds that the claims pressed by the private class and state representatives are identical to the claims which they press on behalf of the nationwide direct purchaser class generally. Beyond this, there is not much more independent significance to the Rule 23(a)(3) requirement. As has been noted, "there appears to be nothing which would fall under this [Rule 23(a)(3)] rubric which is not also covered by one of the other subsections [of Rule 23]." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3rd Cir. 1977).

### 4. Adequacy of Representation

■ Rule 23(a)(4) requires a showing that the class representatives and their attorneys will competently and vigorously prosecute the lawsuit, and that "the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian, Id* at 449.

There is no serious question concerning the satisfaction of the first aspect of the Rule 23(a)(4) requirement. Plaintiffs' counsel in each of the actions brought on behalf of private direct purchasers of fine paper are lawyers with extensive experience in antitrust and multiparty litigation, and defendants have not challenged the quality of the legal services likely to be rendered on behalf of class members. Further, the states of Connecticut, Illinois, Kansas, Minnesota and South Dakota and their respective attorneys general and/or affiliated private counsel are eminently qualified to serve as class representatives and class counsel in this litigation. *See, e.g., Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *State of Illinois v. Harper & Row Publishers,* 301 F.Supp. 484 (N.D.Ill.1969). *See also, Hart-Scott-Rodino Antitrust Improvements Act of 1976,* Pub.L. No. 94–435, 90 Stat. 1383 (1976). Finally, the defendants have not contested the willingness or the ability of the class representatives to prosecute their respective actions. The defendants do, however, argue that the private named plaintiffs have interests which are antagonistic to the other members of the class and, therefore, would be inadequate representatives.

Specifically, defendants argue that the majority of transactions which will be subject to claims in the private actions were made with independent merchant house class members. Defendants argue that they or their alleged co-conspirators made few direct sales to the business and commercial users who constitute the great majority of the proposed class. These businesses and commercial users, defendants

claim, acquired most of their fine paper from merchant houses. Defendants urge that the business and commercial users will not recover damages based on those purchases, however, because *Illinois Brick, supra* limits recovery of damages to direct purchasers. For the business and commercial users to maximize their recovery, therefore, defendants contend that the independent merchant house members must be proven to be members of the fine paper conspiracy as well. In that event, the business and commercial users could also recover damages based on their purchases from independent merchant houses. Accordingly, defendants urge that the presence of this incentive presents an inherent conflict that should prevent independent merchant houses and their customers from being members of the same class.

The simple response to this line of argument is that defendants cannot create a conflict of interest based upon the existence of a conspiracy that is not posited by plaintiffs in their complaints. Plaintiffs have alleged that the fifteen mill defendants and their wholly owned or affiliated subsidiaries have conspired to fix, stabilize and maintain the price of fine paper. Independent merchant houses and private and business commercial users of fine paper who have purchased fine paper directly from the defendant mills or their subsidiaries are all alleged to have been victimized by this conspiracy and all must rely upon the same unitary conspiracy in order to recover damages. That class members may be on different levels of the fine paper distribution process is irrelevant. If at some future point in this litigation, class representatives seek to amend their complaint to charge independent merchant houses with participation in the fine paper price-fixing conspiracy, the provisions of Rule 23(d), including certification of subclasses and allowance of intervenors, will equip the court to adequately deal

with the situation. On the facts of the present record, however, there are no grounds to deny class certification on the basis of inadequacy of representation.[8]

### 5. *Predominance of Common Questions*

Defendants urge that certifications of the nationwide direct purchaser class and the state classes under Rule 23 are improper because individual, rather than common, questions will predominate with respect to the following essential elements of plaintiffs' actions: 1) violation or conspiracy, 2) impact or fact of damage, 3) amount of damage, and 4) fraudulent concealment. The court will treat each element separately.

#### a. *Violation or Conspiracy*

Defendants claim that the conspiracies charged in the private actions and the minority states' actions involve a wide range of non-homogenous products, differing geographic markets and varied purchasing practices, and that as a result, the fine paper industry is not susceptible to an overall conspiracy or class treatment.

I note first that "contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding predominant question." *In re Folding Carton Antitrust Litigation, supra* at 734 (N.D. Ill.1977). Perhaps because of this:

> In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anti-competitive behavior embracing all of the various products and distribution patterns have been credibly pleaded. [citation omitted]. Identical products, uniform prices and unitary distribution patterns are not indispensable for class certification in this context.

8. In my February 16th, 1979 order, I stated initially that all the plaintiffs in the private actions would act as representatives of the class of nationwide direct purchasers, but that to facilitate the court's administration of the litigation, the private plaintiffs should submit the names of three plaintiffs to serve as class representatives for the duration of the litigation. I find the three plaintiffs submitted, Campbell Office Supply Co., Herst Litho, Inc; and Magazine Management Co., to be acceptable.

*Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed,* 574 F.2d 656 (2d Cir. 1978).

Plaintiffs have demonstrated that fine paper is a well-defined product recognized as such by the United States Government,[9] the American Paper Institute, Inc.,[10] various trade journals and directories,[11] and, most tellingly, by certain individual defendants themselves.[12]

■ With respect to the existence of a national conspiracy, private plaintiffs and minority state plaintiffs have alleged a course of conduct by defendants, including exchanges of pricing information occurring at a series of meetings held at different times throughout the United States and Canada, nationwide publication of price announcements and price lists pertaining to fine paper, and allocation of markets among and between defendants. It is not necessary that each defendant market every type of fine paper on a nationwide basis, for plaintiffs need only prove that an over-all fine paper conspiracy existed and that each individual defendant participated in that conspiracy with respect to the fine paper products sold by it in its marketing areas. Differences, if any, in the manner in which this conspiracy was manifested throughout the country do not change the common question whether defendants acted in con-

9. The 1976 Staff Report of the Executive Council on Wage and Price Stability titled "Price Increase and Capacity Expansion in the Paper Industry", states as follows:

>   The major types of paper grades are newsprint, printing, writing, and related papers, and packaging and industrial converting paper . . .
>
>   Printing and writing papers are used in hundreds of essential ways throughout the economy . . . The most important uses of printing paper are for magazines, books, brochures, catalogs, flyers, and financial documents. . . .

10. The American Paper Institute, Inc. ("API"), a trade association in the paper industry, of which defendants are the major members, which was formed in 1966, has a *"Printing—Writing Paper Division".* (API Darrow Dep. 11). The American Paper Institute Product Reference List, which corresponds to the U.S. Bureau of Census codes, includes the following basic grades of paper in the category of *"Printing and Writing"* papers (API Darrow Dep. 25–27, Ex. p–4):

>   *Printing Papers:*
>   Uncoated groundwood paper Coated printing and converted paper Uncoated book paper
>   *Writing Papers:*
>   Chemical wood pulp writing paper Cover and text papers Thin paper Cotton fiber
>   *Bleached bristols*

*Reply on Behalf of Private Plaintiffs and Certain State Plaintiffs to Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion for Class Certification.* Appendix A, pp. 7, 8. (filed 11/20/78).

11. The Portfolio Research Services (Dataquest Inc.) August 1974 Report, titled "The Paper Industry", states as follows:

>   During 1973, the market for printing, writing and related papers was approximately $3.8 billion, an increase of about 15 percent over 1972 and representing a compound annual growth of approximately 7 percent since 1963. Growth from 1972 to 1973 resulted from a substantial increase in the number of tons produced and average price increases of slightly less than 5 percent. During the 1963–73 period, printing, writing, and related papers registered one of the strongest compound annual growth rates in tonnage produced among all paper segments—more than 5 percent.

Also see the 1976 "Kline Guide to the Paper and Pulp Industry" (Kline Industrial Marketing Guide IMG–10–76) which states:

>   In the past 15 years, writing and related papers have exhibited one of the highest rates of growth in the entire paper industry. The major impetus for this growth was the paper explosion in business and industry."

12. Great Northern Nekoosa Corp.'s "1977 Fact Book" states at p. 9:

>   In a large category of paper called "writing and related papers," Nekoosa was the second largest seller in 1976.

Westavco Corp.'s "Annual Report 1976" states at p. 13:

>   Our domestic papermaking operations, consisting of four solidly competitive major mills at Charleston, Covington, Luke and Wickliffe, and a smaller specialty mill at Tyrone, are a cornerstone of our total business.
>
>   Nearly all the products of these mills are sold in three principal markets with good records of growth—fine papers, bleached paperboard and unbleached craft.

Hammermill Paper Co.'s "Annual Report to the SEC for the Year ending Jan. 2, 1977" (Commission File No. 1–3100), states at p. 1:

>   While Hammermill has long been known as a manufacturer and merchandiser of quality-trademark business papers, it also manufactures a wide variety of other fine and printing papers.

cert to decrease competition among themselves and are unimportant, except perhaps as such differences may affect the amount of recovery different class members may obtain. *See In re Master Key Antitrust Litigation, supra* at 26. The court is persuaded that the conspiracy issue—dealing primarily with what defendants themselves said and did—is susceptible of generalized proof.

Defendants also urge that plaintiffs' allegations that merchant houses owned by or affiliated with the mill defendants also violated the antitrust laws transformed a lawsuit involving a horizontal conspiracy among defendant mills into 125 vertical conspiracies between the mill defendants and each of 125 "independent profit centers" controlled by the various mill defendants. This argument is without merit. First of all, from the record before the court, it appears that there are few separate defendant-owned subsidiaries that are accused of conspiring with the defendant mills. Even if it were necessary to prove that each of these few subsidiaries participated in a separate vertical conspiracy distinct from the overall horizontal conspiracy, such proof could be established on a general basis and would be the same for each class member. More importantly, to allow defendants to impose the existence of corporate subsidiaries, divisions or other operating units in order to change a unitary horizontal conspiracy among independent defendants into a plethora of distinct vertical conspiracies sharing no predominantly common questions would permit any corporate antitrust violator to bypass completely the threat of a treble-damage class action remedy. While the existence of defendant-owned subsidiaries and the participation by those subsidiaries in an overall horizontal conspiracy among mill defendants may be relevant to the determination of whether purchasers from those subsidiaries are direct purchasers for purposes of inclusion on the nationwide direct purchaser class, *see In re Sugar Industry Antitrust Litigation,* 579 F.2d 13, 18–19 (3rd Cir. 1978), the presence of such additional co-conspirators cannot detract from what is basically a single horizontal conspiracy theory.

### b. *Impact*

Defendants urge that fact of damage, or impact, cannot be proven on a class basis in the actions herein because the issue of impact does not lend itself to generalized proof where non-homogenous products are involved. Thus, to the extent that the court has already rejected defendants contention of non-homogenity, defendants' arguments must necessarily fall short. The remainder of defendants' contentions are similar to those which were analyzed and rejected by the *Bogosian* court:

. . . [W]hen an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

.  .  .  .  .

If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . proof of some damage flowing from the unlawful conspiracy . . . ." *Zenith*

*Radio* [*v. Hazetine Research Inc.*], supra, 395 U.S. [100] at 114, 89 S.Ct. [1562] at 1571 n. 9 [23 L.Ed.2d 129]. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. See *In Re Antibiotic Antitrust Actions*, supra, 333 F.Supp. [278] at 281, [2nd Cir.].

*Bogosian, supra* at 454–55.

Plaintiffs are attempting to establish a nationwide conspiracy through methods which the *Bogosian* court expressly held to be appropriate for class actions. If successful, impact will have been proven on a generalized basis. *See Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978); *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976).

### c. *Damages*

■ Defendants' contention that damages are not susceptible of proof on a generalized basis is premised on the existence of a wide multiplicity of different fine paper products, pricing practices, and selling entities. To the extent defendants' underlying assumptions have been rejected, their argument again must fail. The court notes that "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Bogosian, supra* at 456. *See also In re Plywood Antitrust Litigation*, 76 F.R.D. 570 (E.D.La.1976).

Furthermore, plaintiffs' expert has stated that "it is likely that generally accepted methods, either individually or in combination with one another, can be used to determine with a reasonable degree of certainty the fact and the amount of damages suf-fered by the class and each class member."[13] If any of the generalized methods for calculating damages suggested by plaintiffs' expert prove applicable, then the determination of damages will become an almost mechanical task. And, of course, if ultimate experience proves that there are problems in proving damages that outweigh the advantages of class certification, this court can, at that later date, pursuant to Rule 23(c)(4)(A), give appropriate consideration of a class limited to the determination of liability. *Bogosian, supra* at 456.

### d. *Fraudulent Concealment*

■ The ability of class members to assert claims predating the four-year limitations period of 15 U.S.C. § 15b is predicated upon proof that defendant fraudulently concealed the existence of a price-fixing conspiracy. Defendants assert that the issue of fraudulent concealment raises predominantly individualized questions of fact. Defendants urge that to establish a claim of fraudulent concealment in order to avoid a statute of limitations defense, a plaintiff must demonstrate: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire and Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975). Defendants argue that failure to discover and exercise of due diligence require individual proof, outweighing common fraudulent concealment issues. I disagree. The key question on the issue of fraudulent concealment will relate to whether defendants successfully concealed the existence of the alleged conspiracy, and the proof of this contention will necessarily be common among the class members. *See In re Plywood Antitrust Litigation, supra* at 586. Furthermore, due diligence, while raising some individual issues, may also invoke certain common proof. Finally, the

---

**13.** *Appendix to Reply on Behalf of Private Plaintiffs and Certain State Plaintiffs to Defendants' Joint Memorandum in Opposition to* *Plaintiffs' Motion for Class Certification* (filed 11/20/78), *Appendix A, Affidavit of Robert E. Lucas, Jr.* at 2.

court notes that the issue of fraudulent concealment is directed to the damage determination phase of this litigation. As discussed above, bifurcation of this litigation into liability and damage segments remains an option if the predominating elements of the question of fraudulent concealment do not prove susceptible to generalized proof.

### 6. *Superiority and Manageability*

■ Before any action may be certified as a class action under Rule 23(b)(3), the court must determine not only that questions of law or fact predominate over individualized questions, but also that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy". Class certification will prove beneficial to all parties in this litigation. Class members who, because of the tremendous costs of discovery and trial that are present in any alleged conspiracy among large business corporations, might not otherwise be able to pursue their claims, are able to share the costs among themselves and thereby have their claims adjudicated in a single lawsuit. And because all members of the class who do not opt are bound by the court's determinations, the defendants, who are quite confident of their ability to prevail on the issues of liability, will be protected from repeated and costly litigation throughout the country if they ultimately do so prevail. *See In re Folding Carton Antitrust Litigation, supra* at 731. Furthermore, the public at large will also derive benefits from class certification. "[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968). This deterrent cannot effectively function if potential violators conclude that large numbers of potential claimants will not be afforded an efficient and cost-effective method of vindicating their claims.

■ To the extent that defendants argue that a multiplicity of products and conspiracies render the handling of many claims in one lawsuit unmanageable, defendants are essentially restating the argument, already rejected by the court, that there are no predominating common questions which can most expeditiously and economically be treated on a class basis. Apart from their contention that individual actions brought by class members are superior to class certification in this litigation, defendants have not urged that other possible methods of adjudication—the test case approach or intervention—are preferable to class action treatment. The court finds that these methods, too, would be duplicative, expensive and time consuming and would offer no countervailing benefits.

While the court holds no illusions concerning the complexities and problems that are likely to present themselves in multidistrict antitrust litigation, the court is mindful that:

> "[F]or a court to refuse to certify a class [action] on the basis of speculation as to the merits of the cause or because of vaguely-perceived management problems is counter to the policy which originally led to the rule, and more especially to its thoughtful revision, and also to discount too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise."

*Yaffee v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1972). The court is fortunate in this litigation to have the assistance of able lawyers for all parties who have already demonstrated a willingness to work together and with the court. With their help, with the suggestions embodied in the Manual for Complex Litigation, and through the use of the powers provided by the Federal Rules of Civil Procedure, the court is confident that whatever problems may arise from certification of a class of nationwide direct purchasers can be satisfactorily resolved.

### B. Denial of Certification of the Majority States' Actions

The nature of the substantive antitrust conspiracy by each of the majority states is

different from the conspiracy charged by the minority states and the private plaintiffs. The majority states allege a conspiracy involving not just defendant mills and mill-owned merchant houses, but also many independent merchant houses. By including the independent house middlemen in their allegations of antitrust violations, the majority states are seeking to establish the existence of a conspiracy that permeates two different levels of the fine paper distribution system, through a horizontal combination among mills and a vertical combination among mills and merchant houses.

The court has discussed, *supra* at pp. 151–153, its finding that the existence of a conspiracy among mill defendants is susceptible to generalized proof. But proof of the existence of conspiracy among the mill defendants, while possibly probative of the independent merchant houses involvement, is insufficient to establish the participation of the many independent merchant houses in the vertical arm of the conspiracy. *In re Master Key Antitrust Litigation, supra* at 26; *DiCostanzo v. Hertz Corp.,* 63 F.R.D. 150 (D.Mass.1974). In addition, the defendants must have an opportunity to rebut any inference such proof of a mill level conspiracy establishes with their own evidence that individual merchant houses from whom class members purchased were not involved in the price fixing scheme. *Smith v. Toyota Motor Sales U.S.A., Inc.,* 1977–1 Trade Cases ¶ 61,-252, pp. 70, 763–64 (N.D.Cal.1977). For this reason, common questions do not predominate.

The majority states have not delineated any other method besides proof of a conspiracy among the mills by which the many independent merchant houses will be shown to have participated in the conspiracy—a showing which each class member who purchased from an independent merchant house makes in order to establish liability. It does not appear that one common set of facts will be sufficient to prove the charged illegality of the conduct of each independent merchant house—mill defendant combination. The majority states will thus

have to prove the existence of an implicit agreement to fix prices or "coercion" of each relevant merchant house in order to establish the liability of the independent merchant house defendants. *Gray v. Shell Oil Co.,* 469 F.2d 742, 747–48 (9th Cir. 1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). *In re 7-Eleven Franchise Antitrust Litigation,* 1972 Trade Cases ¶ 74,156 (N.D.Cal.1972). This court concludes that the necessity of establishing the involvement of the independent merchant houses represents individual questions which predominate over common questions and precludes class certification. *See Smith v. Toyota Motor Sales U.S.A., Inc., supra* at pp. 70, 763–64.

Since a generalized method of proof and common questions do not predominate with regard to proof of liability, the class action is not the superior method of adjudication and the majority states' motions for class certification pursuant to Rule 23 was denied.

## III. THE UNITARY PLAINTIFF ISSUE

The Commonwealth of Massachusetts filed a motion to proceed as a unitary plaintiff in this litigation, grounding its position on the powers of the attorney general to institute actions on behalf of all subdivisions under the laws of the Commonwealth and under the common law. The authority of the state attorney general to bring such an action is properly a question of state law, whereas the propriety of maintaining the action on a representative basis must be determined by Rule 23 of the Federal Rules of Civil Procedure. *State of Alabama v. Blue Bird Body Co., Inc.,* 71 F.R.D. 183 (M.D.Ala.1976), *reversed in part,* 573 F.2d 309 (5th Cir. 1978); *New Jersey v. General Motors Corp.,* 1974–2 Trade Cases ¶ 75,338 (N.D.Ill.1974). To hold otherwise would defeat the purpose of the Federal Rules to provide a uniform procedure for the federal courts and would permit the attorneys general of the states to bring suits in the name of a number of state subdivisions and entities without having to meet the requirements of Rule 23. Therefore, this court will

not permit the Commonwealth of Massachusetts to proceed as a unitary plaintiff in this matter.