

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-5-2002

# In Re Linerboard

Precedential or Non-Precedential: Precedential

Docket No. 01-4535

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"In Re Linerboard " (2002). *2002 Decisions.* Paper 552.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/552

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed September 5, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4535

IN RE: LINERBOARD ANTITRUST LITIGATION
(MDL No. 1261)

WINOFF INDUSTRIES, INC.

v.

STONE CONTAINER CORPORATION; JEFFERSON
SMURFIT CORP.; SMURFIT-STONE CONTAINER CORP.;
INTERNATIONAL PAPER CO.; GEORGIA PACIFIC CORP.;
WEYERHAEUSER PAPER CO.; TEMPLE-INLAND INC.*;
GAYLORD CONTAINER CORP.*; UNION CAMP CORP.;
SIMPSON TACOMA KRAFT CO.; TENNECO, INC.;
TENNECO PACKAGING; PACKAGING CORPORATION
OF AMERICA
(D.C. Civil No. 98-cv-05055)

GENERAL REFRACTORIES COMPANY, ON BEHALF OF
ITSELF AND ALL OTHERS SIMILARLY SITUATED

v.

STONE CONTAINER CORPORATION
(D.C. Civil No. 99-cv-01341)

Stone Container Corporation, Jefferson Smurfit Corp.,
Smurfit-Stone Container Corp., International Paper Co.,
Georgia Pacific Corp., Weyerhaeuser Paper Co., Temple-
Inland, Inc.*, Gaylord Container Corp.*, Union Camp
Corp., Tenneco, Inc., Tenneco Packaging and Packaging
Corporation of America,

Appellants

(*Amended per Clerk's Order dated 2/5/02)

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. MDL No. 1261, 98-cv-05055 & 99-cv-01341)
District Judge: Honorable Jan E. DuBois

Argued: July 19, 2002

Before: McKEE, FUENTES and ALDISERT, Circuit  Judges.

(Filed: September 5, 2002)

        Kenneth W. Starr (argued)

Christopher Landau
Kannon K. Shanmugam
Grant M. Dixton
Kirkland & Ellis
655 Fifteenth St., N.W.
Washington, D.C. 20005

Attorneys for Appellants
International Paper Company, Union
Camp Corporation, Weyerhaeuser
Company, Gaylord Container
Corporation, Tenneco, Inc., Tenneco
Packaging and Packing Corporation
of America

Barbara W. Mather (argued)
Pepper, Hamilton LLP
18th and Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799

Attorneys for Appellants
Jefferson-Smurfit Corp., Stone
Container Corp. and Smurfit-Stone
Container Corp.

2

Steven J. Harper
Steven C. Seeger
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Daniel B. Huyett
Matthew W. Rappleye
Stevens & Lee
111 North Sixth Street
Reading PA, 19603

Attorneys for Appellants
International Paper Company and
Union Camp Corporation

Douglas J. Kurtenbach
James H. Schink
Timothy A. Duffy
Barak S. Echols
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Ralph G. Wellington
Sherry Swirsky
Schnader, Harrison, Segal &
 Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103

Attorneys for Appellants
Weyerhaeuser Company, Gaylord
Container Corporation, Tenneco,
Inc., Tenneco Packaging and
Packaging Corporation of America

3


Edward M. Posner
Paul H. Saint-Antoine
Isabel C. Duffy
Drinker Biddle & Reath LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996

Attorneys for Appellant
Georgia Pacific Corporation

R. Mark McCareins
Dane A. Drobny
Michael J. Mayer
Andrew D. Shapiro
Winston & Strawn
35 West Wacker Drive
Suite 4200
Chicago, IL 60601

Attorneys for Appellants
Jefferson-Smurfit Corp., Stone
Container Corp. and Smurfit-Stone
Container Corp.

Richard C. Rizzo
Jennifer R. Clarke
Will W. Sachse
Donald C. Le Gower
Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

Attorneys for Appellant
Temple-Inland, Inc.

ATTORNEYS FOR APPELLANTS

4


Howard I. Langer (argued)
Sandals & Langer, LLP
One South Broad Street
Suite 1850
Philadelphia, PA 19107

Lead Counsel for All Appellees

Eugene A. Spector (argued)
Jeffrey J. Corrigan
William G. Caldes
Spector Roseman & Kodroff, P.C.
1818 Market St.
Suite 2500
Philadelphia, PA 19103

Michael J. Freed
Steven A. Kanner
William London
Much Shelist Freed Denenberg
 Ament & Rubenstein, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095

Attorneys for Appellees
General Refractories Company and
Co-Lead Counsel for Corrugated
Sheet Plaintiffs

Robert J. LaRocca
Kohn, Swift & Graf, P.C.
One South Broad Street,
 Suite 2100
Philadelphia, PA 19107

Attorney for Appellees
Oak Valley Farms, Inc., Garrett
Paper, Inc. and Local Baking
Products, Inc.

5

H. Laddie Montague
Martin Twersky
Berger & Montague, P.C.
1622 Locus Street
Philadelphia, PA 19103

Attorneys for Appellee
Garrett Paper, Inc.

Roberta D. Liebenberg
Donald L. Perelman
Fine Kaplan & Black
1845 Walnut Street, 23rd Floor
Philadelphia, PA 19103

Attorneys for Appellee
Local Baking Products, Inc.

W. Joseph Bruckner
Janelle K. Beitz
Lockridge Grindal Nauen PLLP
100 Washington Ave. South
Suite 2200
Minneapolis, MN 55401

Attorneys for Appellees
Oak Valley Farms, Inc., Garrett
Paper, Inc. and Local Baking
Products, Inc.

Mark Reinhardt
Mark Wendorf
Reinhardt & Anderson
First National Bank Building
Suite E-1000
332 Minnesota St.
St. Paul, MN 55101

Attorneys for Appellee
Albert I. Halper Corrugated Box
Company

ATTORNEYS FOR APPELLEES

OPINION OF THE COURT

ALDISERT, Circuit Judge:

This appeal by manufacturers of linerboard[1] requires us to decide if the district court erred in granting two motions for class certification by groups of plaintiffs who brought antitrust law suits alleging that the linerboard manufacturers engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. S 1. Appellants contend that plaintiffs failed to establish that the putative class met the requirements of Rule 23(b)(3), Federal Rules of Civil Procedure, which compel the court to:

> find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. [2]

Appellants are represented through briefs and oral argument by two groups of manufacturers, the "International Paper Appellants"[3] and the "Georgia Pacific Appellants."[4]

_____

1. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. Appellants are major integrated manufacturers and sellers of linerboard, corrugated sheets and corrugated boxes.

2. In the posture of the case presented to us, Appellants are not ipsis verbis challenging the district court's determination that the putative classes met the requirements of Rule 23(a).

3. International Paper Co., Weyerhaeuser Paper Co., Gaylord Container Corp., Union Camp Corp., Tenneco Inc., Tenneco Packaging Corp. of America.
4. Georgia-Pacific Corp., Temple-Inland Inc., Jefferson-Smurfit Corp., Stone Container Corp. and Smurfit-Stone Container Corp.

7

After individual law suits were filed in the Northern District of Illinois and the Eastern District of Pennsylvania,5 the cases were transferred by the Judicial Panel on Multidistrict Litigation to the Eastern District of Pennsylvania for coordinated and consolidated pretrial proceedings.

The district court established two classes:

> All persons in the United States who purchased corrugated containers directly from any Defendant at any time during the period October 1, 1993 through November 30, 1995, but excluding Defendants, their respective parents, subsidiaries and affiliates and federal, state and local governmental entities and political subdivisions.
>
> * * * * *
>
> All individuals and entities who purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities.

In re Linerboard Antitrust Litig., 203 F.R.D. 197, 203 (E.D. Pa. 2001) (emphasis added). These classes are presented before us as the "Box Appellees" and the "Sheet Appellees."

The district court concluded that the putative classes met the requirements of Rule 23(a) and noted that:

> there is an overlap between the predominance requirement of Rule 23(b)(3) and the prerequisite of Rule 23(a)(2) that common questions exist. "The courts have repeatedly focused on the liability issues, in contrast to damage questions, and, if they found issues were common to the class, have held that Rule 23(b)(3) was satisfied." 4 NEWBERG ON CLASS ACTIONS, S 18-26.

---

5. A detailed history of the litigation, and action of the Judicial Panel on Multi-District Litigation for coordinating and consolidating pre-trial proceedings, is set forth in In re Linerboard Antitrust Litig., 203 F.R.D. 197 (E.D. Pa. 2001).

Id. at 214.

The court then decided that the putative classes had met the requirements of Rule 23(b). The court determined first, that plaintiffs presented sufficient evidence to support claims that the conspiracy to raise the price of linerboard correspondingly raised the price of corrugated products. It went on to "conclude[ ] that plaintiffs' allegations regarding impact, like their allegations regarding conspiracy, will focus the inquiry on defendants' actions, not on individual questions relating to particular class members." Id. at 220.

I.

The International Paper Appellants argue that the district court erred in holding that Appellees have sufficiently demonstrated that they will be able to prove common impact at trial. In support of this major premise, they contend that the court erred in applying a legal presumption of impact and failing to apply rigorous scrutiny to plaintiffs' proffered impact evidence. They contend also that the court erred in ignoring the individual issues raised by plaintiffs' claim of fraudulent concealment.

For their part, the Georgia Pacific Appellants argue that the district court erred because here the existence of injury, and hence potential liability, requires an inherently individualized inquiry. Similarly, they argue that the court erred in certifying classes because the existence of fraudulent concealment also requires an inherently individualized inquiry.

We review a district court's grant of class certification under an abuse of discretion standard. Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 165-166 (3d Cir. 2001).

> In Katz v. Carte Blanche Corp., 496 F.2d 747, 756-757 (3d Cir. 1974) (in banc), we articulated the standard of review applicable to class action decisions. We must decide whether the 23(a) prerequisites have been met, whether the district court correctly identified the issues involved and which are common, and whether it properly identified the comparative fairness and

> efficiency criteria. If the court's analysis on these points is correct, then, "it is fair to say that we will ordinarily defer to its exercise of discretion" embodied in the findings on predominance and superiority. Id.

Bogosian v. Gulf Oil Corp., 561 F.2d 434, 448 (3d Cir. 1977).

The district court had jurisdiction pursuant to 28 U.S.C. SS 1331 and 1337(a). Pursuant to Rule 23(f), Federal Rules of Civil Procedure, Appellants timely petitioned this court for permission to appeal the district court's September 4, 2001, Order. We granted the petition and allowed the appeal by an order dated December 18, 2001, and now affirm.

II.

In presenting their theory of antitrust liability, Appellees averred that even though demand for linerboard was strong and rising between 1989 and 1992, the manufacturers' prices for linerboard had fallen; that the manufacturers attempted to increase prices during 1991, 1992 and the first half of 1993, but the price increase announcement did not "stick" and, therefore, the manufacturers had to rescind them. It was at this point in September 1993, plaintiffs allege, that Roger Stone, president of Stone Container Corporation, the largest corrugated paper manufacturer, reported that "the past five years have been the only five-year period (going back as far as the 1920's) when the containerboard industry has had consistently declining prices. It's never happened before, never happened in the depression, but it's happened these last five years." App. at 710.

According to plaintiffs, declining prices were attributed to excess inventory or inventory overhang. They also maintained that Stone Container masterminded a two-fold plan among the manufacturers to lower the industry inventory to a five-week supply for a 2.5 million ton threshold, in order to implement price increases. The Packaging Corporation of America stated in the fall of 1993:

> Weakness in containerboard pricing during the first half of 1993 was more supply-related than demand-

10

> related. Earlier this year, industry inventories of containerboard hovered above 2.9 [million] tons and nearly [six] weeks of supply, above the 2.5-2.6 [million] tons and 5.0-5.2 week range usually required to sustain a price increase.

App. at 1553.

The plan was two-fold. First, the manufacturers would close their mills for "market downtime," thereby reducing industry inventory at mills and box plants. Second, Stone would purchase inventory from other manufactures while idling its own mills. In implementing this conspiracy, during late June and early July 1993, Roger Stone conducted a telephone survey of his competitors. He coordinated the industry-wide downtime and agreed to have his company purchase a significant volume of linerboard from its competitors rather than meet the requirements from its own production. Stone took downtime of

approximately 180,000 tons of containerboard by shutting six of its mills during the following weeks and months.

The manufacturers closed their mills between July and December. By October 1993, they had concerted their actions and had lowered total inventories to the desired level of less than a five-week supply. A total of 435,000 tons had been withdrawn from the market. Inventory reached "a twenty-year low in terms of weeks of supply . . . ." App. at 733. In October 1993, Appellants successfully increased their prices for containerboard and boxes for the first time in more than two years. Each raised its container prices by an identical amount. Subsequently, the major manufacturers continued their pattern of taking substantial downtime and implementing price increases. In late November, less than two months after the successful October 1 price increase, Stone announced another $30 per ton increase to be effective on January 1, 1994, even though analysts were not expecting another attempt to raise containerboard prices until February or March of that year. Other manufacturers joined, and the price increase became effective in March 1994.

In April 1994, Appellants justified another containerboard price increase citing low inventory. Between

11

the summer of 1993 and March 1995, seven containerboard price increases were implemented in the industry. Linerboard prices in the eastern United States rose in six consecutive escalations from a low of around $270 to $290 per ton in the third quarter of 1993 to $530 per ton by April 1995. Plaintiffs allege that the roughly 90% recovery in prices resulted in a sharp resurgence in industry profitability as the containerboard increases were passed through in the form of finished box prices. Even the most debt-laden industry players had returned to profitability by the fourth quarter of 1994. App. at 1265.

Thus, plaintiffs' theory of antitrust liability is based on poly-syllogisms: (1) Prices in the marketplace are controlled by the economic laws of supply and demand, to wit, if a product is in short supply, the price will increase. During the period in question, linerboard was in short supply. Therefore, during this period, the price of linerboard increased. (2) Closing down production will create a shortage in supply and a corresponding price increase. The linerboard manufacturers closed down production. Therefore, the linerboard manufacturers created a shortage in supply and a price increase.

III.

We address first, the contention that the court erred in applying a presumption of impact, in order to demonstrate that questions of law and fact common to the members of the class predominate over any questions affecting only individual members. The district court did apply such a

presumption, relying on the oft-quoted statement in Bogosian, familiarly described as the "Bogosian short-cut":6

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price

---

6. See Affidavit of Dr. Robin Cantor, App. at 608-629.

> structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. "[The] burden of proving the fact of damage under S 4 of the Clayton Act is satisfied by . . . proof of some damage flowing from the unlawful conspiracy . . . ." Zenith Radio [Corp. v. Hazeltine Research, Inc.], 395 U.S. [100, 114 n.9 (1969)]. Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations. See In re Antibiotic Antitrust Actions, 333 F. Supp. [278, 281 (S.D.N.Y. 1971)].

Bogosian, 561 F.2d 434, 455 (3d Cir. 1977) (emphasis omitted).7

Appellants challenge the following determination of the district court:

---

7. The panel was unanimous on this point. The dissent would have affirmed the grant of summary judgment, contending that plaintiffs had six years of discovery in order to decide on a theory of liability and should not have been given additional time to do so.

> This is not a pro se case. Plaintiffs' counsel are competent, experienced and, in fact, nationally renowned attorneys in the antitrust field . . . In my view [after six years], this case has long since passed the stage where anyone concerned--parties, lawyers, or judges--should have to speculate as to the theory of the litigation . . . Moreover, until the theory of the case is settled, it will not be known which facts are "relevant" facts. Facts are only relevant insofar as they support a valid legal theory.

Bogosian, 561 F.3d at 457 (Aldisert, J., dissenting).

13

> Plaintiffs have shown that they plan to prove common impact by introducing generalized evidence which will not vary among individual class members. For example, plaintiffs contend that even though prices may have varied among regions, the alleged conspiracy caused these prices to rise throughout the country. Although the prices for corrugated sheets and boxes may have increased due to demand, because defendants allegedly conspired to reduce production of linerboard, the price was higher than it would have been under competitive conditions. Such allegations, supported by the evidence presented, are of the kind contemplated by the Third Circuit in Bogosian  and Newton. See also, Lumco Indus.,[Inc. v. Jeld-Wen, Inc.], 171 F.R.D. [168, 173 (E.D. Pa. 1997)].

> The Court recognizes that defendants dispute plaintiffs' allegations. However, at the class certification stage, "the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law." Lumco Indus., 171 F.R.D. at 174. "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." Id. (citing In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524 (M.D. Fla. 1996)). Therefore, the Court concludes that plaintiffs' allegations regarding impact, like their allegations regarding conspiracy, will focus the inquiry on defendants' actions, not on individual questions relating to particular plaintiff class members.

Linerboard, 203 F.R.D. at 220.

A strong argument can be made that the Bogosian concept of presumed impact was properly applied here. The economic laws of supply and demand run in tandem with the tenets of logic. A reduction in supply will cause prices to rise. A deliberate cut in supply, as alleged here, is a deliberate interference with market forces. Coincident with this interference with the normal market forces, linerboard

14

prices in the eastern United States rose in six consecutive price increases, from a low of around $270 to $290 per ton in third quarter 1993 to $530 per ton by April 1995. Reduced to its essence, what Appellants say is that there is no correlation between the reduction in supply of linerboard and the subsequent price increases. What they

really contend is that plaintiffs' argument is anchored on the familiar fallacy of post hoc propter hoc, the fallacy of inferring causation from temporal succession only, a reasoning from what happens in sequence is merely an assumption of a causal connection.

The post hoc accusation is trumped, however, by the laws of economics. If the facts do, in fact, support plaintiffs' theory that "an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price[,]" Bogosian, 561 F.2d at 455, this would be a demonstration of the laws of supply and demand at work.

IV.

But there is more to this case than exclusive reliance on the presumed impact theory. The district court used a belt and suspenders rationale to support its conclusion that the putative class had met its burden of showing impact. In addition to relying on the Bogosian short cut, it credited the testimony of plaintiffs' experts, opinions that were supported by charts, studies and articles from leading trade publications. These experts suggested that advanced econometric models could be effectively prepared to establish class-wide impact.

A.

In reaching its decision, the district court made note of plaintiffs' expert Dr. John Beyer, who presented two possible means of assessing impact on a class-wide basis-- multiple regression analysis, and the benchmark or yardstick approach, which he described as methods of showing "an antitrust impact by generalized proof." Affidavit of Dr. John C. Beyer, App. at 673-675. See also , In re

15

Plastic Cutlery Antitrust Litig., No. CIV. A. 96-CV-728, 1998 WL 135703, at *7 (E.D. Pa. Mar. 20, 1998); In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 485-486 (W.D. Pa. 1999) (identifying multiple regression analysis as a method of proving impact).

Dr. Beyer made an extensive empirical investigation into the behavior of linerboard and corrugated box prices over time, which proved a basis for his opinion of common impact. He stated that he had studied the structure of the industry, including Appellants' market power, geographical overlap, the fungible nature of the products, the inelastic demand and lack of a substitute. He found that "corrugated container prices are strongly influenced by linerboard prices." Because of these industry characteristics "all class members would be impacted by higher corrugated container prices." App. at 672.

Significantly, Dr. Beyer stated that he found that

linerboard and corrugated box prices were closely correlated. He concluded that linerboard transaction prices, as well as corrugated containerboard prices, behaved similarly over time across different regions of the country and across different types of linerboard. These findings, sometimes referred to as "structure in pricing," demonstrated to Dr. Beyer that "[d]espite any variations in particular boxes or customers, prices for all corrugated containers would have responded over time to linerboard price increases in a similar manner . . . ." Id. Based on this qualitative analysis, he concluded that the "alleged conspiracy would have had a common, class-wide impact, and that all purchasers of corrugated containers would have paid a higher price as a result of the conspiracy." Id. at 673. We deem his conclusion to be significant because it was supported by charts and studies.

In discussing these feasible approaches, which could be used to provide quantitative methods for corroborating his opinion on impact and for estimating damages, he suggested as a potential benchmark, the potential prices charged for linerboard during a competitive period when there would be no effects of the conspiracy. He explained that the necessary data was available to do the analysis and described the types of data he would use. He discussed

16

also a multiple regression model "to isolate the effects of various influences on corrugated container prices, thereby allowing a determination of the impact of any one of the variables, including, in this case, the impact of the conspiracy." Id. at 674.

B.

The plaintiffs also presented an affidavit of Dr. Robin C. Cantor who stated that "[b]ased on my analysis of the pricing data and company records, I conclude that the alleged unlawful conduct to raise linerboard prices would have impacted all members of the proposed class through higher corrugated sheet prices." App. at 612. We deem this conclusion to also be extremely significant.

Such a conclusion was supported by relevant data. For example, she indicated that the containerboard industry is relatively concentrated and that during the relevant period, 77 percent of linerboard and 71 percent of the "corrugated medium" was produced by the top ten firms and that overall, 73 percent of containerboard production was concentrated in the top ten firms. Id. at 614. She also indicated that benchmark prices are published weekly in a number of sources including "The Yellow Sheet," "Pulp and Paper Week" and "Pulp & Paper's North American Fact Book," and that "[a]ccording to a Weyerhaeuser document, 'linerboard is the industry's indicator price.' " Id. at 619. Dr. Cantor recognized that "[c]orrugated boxes are the most popular shipping containers in the world. Over 90 percent of all products in the United States are shipped in

corrugated cardboard boxes." Id. at 623 (quoting the American Forest and Paper Association website). Emphasizing this dominance over the shipping industry, Dr. Cantor remarked that:

> [t]he market began to turn in the third quarter of 1993 when containerboard producers announced an estimated 400,000 tons of downtime to reduce linerboard and medium inventories just as box shipments began to pick up. [(quoting Linerboard: Prices Soar to Record Levels as Shortage Condition Prevail, PULP & PAPER WEEK, Vol. 69, No. 1 at 13).]

17

> The industry is gradually responding to the soft linerboard market by announcing significant downtime to be taken in the third quarter. Announcements to date of downtime by Stone, Temple-Inland, Union Camp, IP and [Packaging Corporation of America] amount to roughly 300,000-350,000 tons of production or 5.4% of the industry's capacity during the three month period." [(quoting Linerboard Markets--Industry Report, Donaldson, Lufkin & Jenrette Securities, August 10, 1993).]

App. at 626.

She also indicated that there are several accepted statistical or mathematical approaches that could be used to determine the percentage or absolute overcharge due because of the effect of a conspiracy to manipulate prices. App. at 628. She suggested that "benchmarking," which uses "competitive prices for other comparable products to estimate the pattern of prices but-for the alleged misconduct[,]" could be effectively employed in this situation. Id. Another proffered model would "compare[ ] prices during non-conspiratorial periods with product prices during the alleged conspiracy," and yet a third approach would use revenue, production and profit data to derive prices that are consistent with "yardstick" competitive performance levels.

Most significantly, she concluded:

> In sum, containerboard and corrugated sheet products exhibit sufficient characteristics and their sale and production exhibit sufficient economic conditions to control for product variations in a price analysis. In combination, these characteristics and conditions indicate that a price-fixing conspiracy would have a common impact on all members of the proposed class and that feasible methods can be used to estimate damages reliably on a class-wide basis.

App. at 629.

C.

Based on the foregoing, we conclude that the district court did not err in determining that plaintiffs showed that

they could establish injury on a class-wide basis. Plaintiffs produced affidavits of expert witnesses, Dr. Beyer and Dr. Cantor, who effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur such damages. We decide that this was not a case where plaintiffs relied solely on presumed impact and damages.

In commenting on plaintiffs' submissions, the district court referred to the teachings of Newton for the proposition that this court does not require plaintiffs to have selected a particular econometric model for demonstrating impact (or proving damages) at the class certification stage. In In re Corrugated Container Antitrust Litig., 80 F.R.D. 244 (S.D. Tex. 1978), the identical situation was presented to that court where plaintiff had identified two generally accepted methodologies, which he planned on using to determine impact and damages. Relying heavily on Bogosian , the court accepted that contention and certified the class. Id. at 251-252. Without explicitly so stating, the district court, like the Corrugated Container court, did not require the experts to pick one particular method over another at the class certification stage, recognizing that the certification stage is early in the overall litigation process. Linerboard, 203 F.R.D. at 219.

Accordingly, we reject the contention that plaintiffs did not demonstrate that sufficient proof was available, for use at trial, to prove antitrust impact common to all the members of the class.

V.

A significant portion of Appellants' briefing, and a major emphasis at oral argument, was that the factual allegations alleged here track precisely the factual scenario in Newton, and therefore, the district court erred in not following the holding of Newton and denying class certification. At oral argument, counsel for Appellants referred to Newton as "provid[ing] the guide for resolution in this case" and referred to a single sentence contained therein that constituted, in his formulation, a "teaching[that] holds with respect to both of our submissions today."8 That passage

---

8. Counsel: Let me, if I may, begin with this Court's decision in Newton, which we believe provides the guide for

reads as follows: "If proof of the essential elements of the cause of action requires individual treatment, the class certification is unsuitable." Newton, 259 F.3d at 172 (citing

Binder v. Gillespie, 184 F.3d 1059, 1063-1066 (9th Cir.
1999) (upholding class decertification where presumption of
reliance and loss unavailable), cert. denied, 528 U.S. 1154
(2000)).

We have several problems with this argument. In and of
itself, the quotation can be interpreted as the obverse of
Rule 23(b)(3), Federal Rules of Civil Procedure, in the sense
that "if any questions affecting individual members"
predominate over "questions of law and fact," class
certification is unsuitable. Clearly, if proof of the essential
elements of the cause of action require individual
treatment, then there cannot be a predominance of
"questions of law and fact common to the members of the
class."

Equally important, the quotation at issue must be
considered in the precise context in which it was used in
Newton. It formed the final sentence of a paragraph in
which we discussed permissible presumptions proof of
reliance and injury in securities cases. Having cited a
number of cases upholding presumptions of reliance in
Rule 10b-5 claims, we stated that where a presumption of

_____

> resolution in this case.
>
> *   *   *   *   *
> And I would like to guide the Court . . . to the language
> in Newton. And if you will indulge me, I'm going to quote
> one sentence. . . . If proof, if proof of the essential
> elements of the cause of action requires individual
> treatment, then class certification is unsuitable.
>
> Now, that teaching holds with respect to both our
> submissions today. [Co-counsel] has been speaking
> about causation or impact or injury. It also goes to proof
> of the essential elements of fraudulent concealment, the
> second part of our submission today.

Transcript of Oral Argument in In re Linerboard Antitrust Litig., No. 01-
4353 (before the Court of Appeals for the Third Circuit, recorded in
Philadelphia, Pennsylvania, July 19, 2002, at 16-17).

reliance and loss was not available, as in Binder, it would
be necessary for each plaintiff to prove the essential
elements of the cause of action, and, if so, class
certification would be unsuitable. Newton, 259 F.3d at 172.
In Binder, the court affirmed the denial of class
certification, stating that "[t]he district court reasoned that
the class would have to satisfy the reliance element through
a presumption; otherwise individual questions of reliance
would predominate over questions common to the class."
Binder, 184 F.3d at 1063.

A.

We consider it useful to identify the precise flashpoint of controversy at stake in Newton. Roscoe Pound taught us that the judicial process distinguishes discrete functions in the appellate decisional process: (1) finding or choosing (or creating) the law where the dispute is over the choice of the controlling legal precept; (2) if there is no dispute as to its selection, a disagreement over its interpretation; and (3) where there is agreement on the precept and its interpretation, the sole question is the application of the law to the facts, which Pound described as "[a]pplication of the abstract grounds of decision to the facts of the particular case."9 The precise holding in Newton was that the facts common to the members of the class did not predominate. No new legal precept was created; no new nuance of interpretation was forthcoming. It was merely the application of ruling case law in this court to the facts of that case.

The process of justifying a court's decision always requires application of a legal precept to a particular factual situation. The application may be purely mechanical, as it is in most cases. If the facts are similar to those in an earlier case announcing a rule of law, the doctrine of precedent becomes operative. Where there is no quarrel over the choice and interpretation of the legal precept, here Rule 23(b)(3), the root controversy usually is traced to a value judgment of whether there is sufficient similarity

---

9. Roscoe Pound, The Theory of Judicial Decision, 36 HARV. L. REV. 940, 950-951 (1923).

between the fact situations under comparison. Edward R. Levi amply described this kind of assessment when he stated: "[t]he scope of a rule of law, and therefore its meaning, depends upon a determination of what facts will be considered similar. . . . The finding of similarity or difference is the key step in the legal process."10 To predict a court's actions in a precept-application controversy, therefore, requires a prediction of what facts in the compared cases a given court, at a given time, will deem either material or insignificant. The facts considered material are "adjudicative facts," described by Hart and Sacks as "facts relevant in deciding whether a given general proposition is or is not applicable to a particular situation."11

B.

For Appellants' argument to prevail, therefore, they must demonstrate that the facts in Newton are substantially similar to the facts in the case at bar, what logicians call inductive reasoning by analogy, or reasoning from one particular case to another. To draw an analogy between two entities is to indicate one or more respects in which they are similar and thus argue that the legal consequence attached to one set of particular facts may apply to a different set of particular facts because of the similarities in

the two sets. Because a successful analogy is drawn by demonstrating the resemblances or similarities in the facts, the degree of similarity is always the crucial element. You may not conclude that only a partial resemblance between two entities is equal to a substantial or exact correspondence.

Logicians teach that one must always appraise an analogical argument very carefully. Several criteria may be used: (1) the acceptability of the analogy will vary proportionally with the number of circumstances that have been analyzed; (2) the acceptability will depend upon the number of positive resemblances (similarities) and negative

_____

10. Edward H. Levi, Introduction to Legal Reasoning, 15 U. Chi. L. Rev. 501, 501-504 (1948)

11. HENRY HART & ALBERT SACKS, THE LEGAL PROCESS 384 (tent. ed. 1958).

resemblances (dissimilarities); or (3) the acceptability will be influenced by the relevance of the purported analogies. IRVING M. COPI & KEITH BURGESS-JACKSON,INFORMAL LOGIC 166 (3d ed. 1996); Arthur L. Goodheart, Determining the Ratio Decidendi of a Case, 40 YALE L.J. 161, 179 (1930); JOHN H. WIGMORE, WIGMORE'S CODE OF THE RULES OFEVIDENCE IN TRIALS AT LAW 118 (3d ed. 1942); JOHN STUART MILL, A SYSTEM OF LOGIC RATIOCINATIVE AND I NDUCTIVE 98-142 (8th ed. 1916) ("Two things resemble each other in one or more respects; a certain proposition is true of one; therefore it is true of the other.").

For Appellants to draw a proper analogy, they had the burden in the district court, as they do here, of showing that the similarities in the facts of the two cases outweigh the differences. They cannot do so, for two significant reasons. First, in Newton it was clear that not all members of the putative class sustained injuries; here, all members sustained injuries because of the artificially increased prices. Secondly, in Newton there were hundreds of millions of stock transactions involved, thus making the putative class extremely unmanageable; here, an astronomical number of transactions is not present. The classes are manageable.

We reversed the district court's determination of class certification in Newton because it involved a putative securities class action in which purchasers of stocks charged that their broker-dealers breached their duty to execute trades on the most favorable terms reasonably available. Newton, 259 F.3d at 161-163. The gravamen of the complaint was that their brokers could have received a better price for securities had they used a computer system other than the central National Best Bid and Offer system ("NBBO"). The evidence disclosed that on some occasions, the NBBO price was better than on other computer

systems, at times, the prices were the same, and at other times, the NBBO price was worse than on other systems. Id. at 177-180. Under those circumstances, we concluded that not every class member was injured by the failure of the brokers to find the best possible price. Id. at 187-188.

Critical to our determination of whether class certification was proper, we noted that in determining how to execute a

client's order, a broker-dealer must take into account order size, trading characteristics of the security, speed of execution, clearing costs, and the cost and difficulty of executing an order in a particular market. Id. We were very specific in this respect:

> These factors would appear to vary from class member to class member and, for each class member, from trade to trade. Whether a class member suffered economic loss from a given securities transaction would require proof of the circumstances surrounding each trade, the available alternative prices, and the state of mind of each investor at the time the trade was requested. This Herculean task, involving hundreds of millions of transactions, counsels against finding predominance.

> *   *   *   *   *

> The alleged injuries in Newton arise out of the execution of hundreds of millions of trades, not a single act of fraudulent conduct. The distinct facts among the hundreds of thousands of plaintiffs involving hundreds of millions of trades will determine whether securities violations occurred. Because plaintiffs' claims will require an economic injury determination for each trade, we hold the putative class fails to satisfy the predominance requirement.

Id. at 187, 190.

Contrasting the Newton facts with those in the case at bar, here there was no evidence that the individuals and entities who purchased corrugated containers or corrugated sheets from Appellants during the relevant two-year period had participated in hundreds of millions of commercial transactions. More important, the Newton court was staring a situation in the face where they would necessarily examine every stock purchase or sale because not every member of the putative class was injured. By direct contrast, with certain limited exceptions relating to purchasers whose contracts were tied to a factor independent of the price of linerboard, all purchasers of corrugated sheets and boxes were injured. They were all

affected by the increased price of linerboard that reflected in the price paid by plaintiffs.

For the foregoing reasons, we conclude that we cannot accept the analogue so vigorously urged by Appellants because the negative resemblances (dissimilarities) between Newton and the case at bar seriously outweigh the positive resemblances (similarities).

VI.

The Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), bans Clayton Act lawsuits by persons who are not direct purchasers from the defendant antitrust violator. Appellants argue that the district court should have denied class certification, under the teachings of Illinois Brick, because members of the proposed classes purchased corrugated sheets or boxes, of which linerboard was a mere ingredient, and did not purchase linerboard per se. Appellees respond, as they did in the district court, that the facts here come within the purview of our decision and rationale in In re Sugar Indus. Antitrust Litig. , 579 F.3d 13 (3d Cir. 1978), in which we held that the purchasers of candy made by the sugar manufacturers were not barred from bringing suit under the S 1 of the Sherman Act, 15 U.S.C. S 1, and S 4 of the Clayton Act, 15 U.S.C. S 15.

We posed the question succinctly: Does Illinois Brick bar suit by a plaintiff who purchases directly from the alleged offender, but buys a product which incorporates the price-fixed product as one of its ingredients? We held that there was no bar.

Our reasoning began with an explication of the rationale behind Illinois Brick:

> The Court grounded its conclusion on several bases, including the possibility of exposing the defendant to multiple liability and the evidentiary complexities that would arise in apportioning the overcharge among those in the chain who had suffered injury. The Court also expressed concern that if the direct purchaser could not make a full recovery of the overcharge, the wrongdoer would be able to keep some of the fruits of

25

> its illegality. Based on this reasoning, the Court held that the plaintiff, which purchased a completed building, was not permitted to sue the manufacturer of concrete block which had been incorporated into the structure.

In re Sugar, 579 F.3d at 17.

We then explained why this rule would not apply to the purchasers of candy made with the price-fixed sugar:

> As the defendants here point out, the product which

plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price. To this extent, there will be some additional complications underlying the damage claims. However, this must not be allowed to obscure the fact that the plaintiff did purchase directly from the alleged violator. True, the price-fixed commodity had been combined with other ingredients to form a different product. But just as the sugar sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers. The situation is the same as if the general contractor which sold the building to the plaintiff in Illinois Brick were the manufacturer of the concrete block which went into the structure. In that situation, the concern which the Supreme Court expressed about the proration of overcharge among a number of entities in the chain would not have been present.

Nor is that problem of allocation among various distributors present in the case sub judice. Plaintiff is a direct purchaser and, therefore, entitled to recover the full extent of the overcharge.

Id. at 17-18.

In the case at bar, the district court met this issue head-on, and we agree completely with its analysis. It emphasized that the putative class plaintiffs purchased corrugated sheets or boxes directly from Appellants, and, like the candy in In re Sugar, which contained allegedly price-fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement. Accordingly,

26

the putative class members are direct purchasers and are entitled to recover the full amount of any overcharge. See Gen. Leaseways v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594-595 (7th Cir. 1984) ("An agreement on output also equates to a price-fixing agreement. . . . [If] firms restrict output directly, price will . . . rise in order to limit demand to the reduced supply. . . . [R]educing output, and dividing markets have the same anticompetitive effects.").

VII.

This is not a securities case. It is an antitrust case involving allegations that several United States manufacturers of linerboard engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of S 1 of the Sherman Act, 15 U.S.C. S 1. It is well settled that "[a]ny action to enforce any cause of action under section 15, 15a, or 15c . . . shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. S 15b.

Appellants contend that Appellees' claims are timed-barred because most of the class period--from October

1993 to November 1995--ended more than four years before the filing of the sheet and box complaints in May 1999. Appellees agree on the time period, but respond that the four-year statute of limitations should be tolled under the doctrine of fraudulent concealment because they had no knowledge of the alleged conspiracy or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence. They contend that it was not until approximately February 25, 1998, when the Federal Trade Commission issued a press release, a complaint and a proposed consent decree against Appellant Stone Container Corporation, describing certain facets of anti-competitive conduct, that they became aware of Appellants' misadventures.

A.

Although S 15b mandates a four-year statute of limitations for civil antitrust actions, it is well established that the doctrine of fraudulent concealment tolls the

limitation period when a plaintiff 's cause of action has been obscured by the defendant's conduct.

> [I]n order to establish the applicability of the doctrine, an antitrust plaintiff must show three things: (1) fraudulent concealment; (2) failure on the part of the plaintiff to discover his cause of action notwithstanding such concealment; and (3) that such failure to discover occurred [notwithstanding] the exercise of due care on the part of the plaintiff.

70 A.L.R. FED. 498 (1984).

Where an action implicating fraudulent concealment is sought to be brought in a class posture, we must decide whether the required elements of proof are too individualized to permit such treatment.

"It generally has been recognized that the question of concealment by [an] antitrust defendant is a common question, subject to being uniformly resolved on behalf of all members of the class." In re Flat Glass , 191 F.R.D. at 487 (citing In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 519 (S.D.N.Y. 1996); In re Fine Paper Antitrust Litig., 82 F.R.D. 143, 154-155 (E.D. Pa. 1979)). "However, the question of discovery of the cause of action by a plaintiff presents an individual question." Id. "Similarly, the issue of due diligence seemingly raises an individual question." Id. "Thus, the broad issue of fraudulent concealment presents both common and individual issues; therefore, the determination whether an antitrust action involving fraudulent concealment may proceed as a class action turns upon which aspect of the issue may be considered to predominate." Id. (citing Hedges Enters., Inc. v. Cont'l Group, Inc., 81 F.R.D. 461, 476 (E.D. Pa. 1979)).

The cumulative experience of the judiciary has not been uniform in this regard. Some courts have regarded the issue of concealment to predominate, and have held that class certification is permissible, even though some individual questions are present. Other courts have considered individual questions to be too pervasive to permit it to be handled as a class matter. In this judicial

circuit, there has been a division of authority, with some cases supporting each view.12

B.

Appellants argue that common issues of proof do not predominate with respect to the fraudulent concealment issue and that therefore a class action is not the appropriate vehicle for deciding Appellees' claims. International Paper Appellant's Brief at 38-43. They suggest that fraudulent concealment involves a "two-pronged" inquiry--a concealment by the defendant and plaintiff 's actual knowledge of it or failure to use due care to discover it--and cannot be established unless both prongs are satisfied. In asserting their position, they rely on the language of the Court of Appeals for the Fourth Circuit: "when the defendant's affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff 's case, class certification is erroneous." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 342 (4th Cir. 1998) (alteration in original) (internal quotation marks omitted); see also, Chevalier v. Baird Sav. Ass'n, 72 F.R.D. 140 (E.D. Pa. 1976); In re Anthracite Coal Antitrust Litig., 78 F.R.D. 709 (M.D. Pa. 1978); Krehl v. Baskin-Robbins Ice Cream Co., 78 F.R.D. 108 (C.D. Cal. 1978).

They argue that a number of Appellees are barred from asserting a fraudulent concealment defense to the statute of limitations because they either had prior knowledge of

---

12. In some cases, the courts held that common questions predominated, and that class actions therefore were permissible. See In re Flat Glass, 191 F.R.D. 472 (W.D. Pa. 1999); In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322 (E.D. Pa. 1976); Hedges Enters., Inc. v. Cont'l Group, Inc., 81 F.R.D. 461 (E.D. Pa. 1979); In re Fine Paper Antitrust Litig., 82 F.R.D. 143 (E.D. Pa. 1979); In re Glassine & Greaseproof Paper Antitrust Litig., 88 F.R.D. 302 (E.D. Pa. 1980). On the other hand, other Third Circuit District Court cases have expressed the view that questions relating to fraudulent concealment in antitrust class actions do not present sufficiently common issues as to permit class action treatment. See Chevalier v. Baird Sav. Ass'n, 72 F.R.D. 140 (E.D. Pa. 1976); In re Anthracite Coal Antitrust Litig., 78 F.R.D. 709 (M.D. Pa. 1978); Wolfson v. Artisans Sav. Bank, 83 F.R.D. 547 (D. Del. 1979); Susquehanna v. H & M, Inc., 98 F.R.D. 658 (M.D. Pa. 1983).

the conspiracy, or did not act with the requisite due diligence, emphasizing that this sort of inquiry is highly personal and is susceptible only to individualized proof and, therefore, inappropriate for class treatment. 13

_____

13. Appellants introduced evidence that "each of the five named plaintiffs stands in a unique position with respect to fraudulent concealment that will have to be individually adjudicated if that plaintiff is to recover." International Paper Appellant's Brief at 46. They refer to Lisa Garrett, president of Garrett Paper, who testified that she was "sure" that something illegal was afoot when Garrett Paper's prices for corrugated boxes increased during the alleged class period, that she "plain as day told [her] salesman that" Appellants were fixing prices, and that she knew such activity was illegal. International Paper Appellant's Brief at 46-47.

Similarly, Appellants contend that Appellee Oak Valley was also aware of the price increases and allegedly told Stone Container that "you'd better lower your box prices," though Oak Valley is uncertain whether that conversation took place during the class period. International Paper Appellant's Brief at 47. They emphasize that Oak Valley testified that it "accepted the increases in the matter of course and never really questioned it." Id. They assert also that although Local Baking now says it had no knowledge during the alleged class period of changes in the average market price for corrugated products, or of any downtime taken by linerboard manufacturers, Local Baking has testified that it was told by Appellant Stone Container that prices were increasing because of a decrease in linerboard. They refer to the testimony of David Halper, president of Alfred I. Halper Corrugated Box Co., Inc., who testified that he was aware of the increased prices that Appellants had charged Halper during the class period, and that he had even complained to Appellants about the increases. Appellants argue that Halper has no greater knowledge today about the existence of a conspiracy than he did during the alleged class period.

Finally, they note that General Refractories sold all of its operating assets in 1994, in the middle of the class period and years before any complaint was ever filed in this case. They state that there were no communications, other than invoices, between Appellants and General Refractories during the class period, and that General Refractories could not identify any facts discovered after the class period that led to filing its complaint, and in particular none that led to the naming of entities other than Stone Container as defendants. International Paper Appellant's Brief at 48-49. And, in contrast to Garrett Paper and Halper, Appellants contend that General Refractories does not appear to have had any suspicion of wrongdoing during the alleged class period based on price increases for corrugated sheets.

To be sure, certain determinations involving the fraudulent concealment defense to the statute of limitations will require individualized proof, which might vary among the assorted Appellees. However, most courts have refused to deny class certification simply because there will be some individual questions raised during the proceedings. In rejecting the rationale in Broussard, the Court of Appeals

for the First Circuit determined:

> Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier. In other words, the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the

_____

It is Appellants' case that the factual complexities relating to these five named plaintiffs underscores the inherently individualized nature of a fraudulent concealment analysis. Appellants insist that the named Appellees would have to prove, among other things: (1) that Garrett Paper's conceded awareness of alleged illegality does not qualify as actual "discovery;" (2) that Garrett Paper's considered inaction in the face of such awareness qualifies as "due diligence;" (3) that Garrett Paper's asserted small size excuses its inaction; (4) that none of the other named Appellees knew or had reason to know about the alleged illegality in the exercise of due diligence, even though some of them complained about the price increases whereas others were not even aware of those increases; (5) that something was "fraudulently concealed" from all putative class members, even though some of them have conceded that they are aware of no more incriminating facts now than they were during the alleged conspiracy; (6) that unique relationships do not affect the due-diligence inquiry; (7) that named Appellees who claimed not to have known of Stone Container's downtime exercised "due" diligence, when such downtime was widely publicized in the industry at the time; (8) that General Refractories, which went out of business in the middle of the class period, is held to a due-diligence standard even after that point; and (9) that alleged oral misrepresentations made to some named Appellees but not others, regarding the reasons for the price increases does not affect the due-diligence analysis. Id.  at 49-50.

> sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3). See 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE P 23.46[3] (3d ed. 1999). Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000). We accept this reasoning as more persuasive than that espoused by the Court of Appeals for the Fourth Circuit in Broussard.

Notwithstanding the individual determinations that will undoubtedly arise at trial, common issues of concealment predominate here because "the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." In re Flat Glass , 191 F.R.D. at 488. Key questions will not revolve around whether Appellees knew that the prices paid were higher than they

should have been or whether Appellees knew of the alleged conspiracy among Appellants. Instead, the critical inquiry will be whether "defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class." Id.14 It is the fact of concealment that is the polestar in an analysis of fraudulent concealment. It is the camouflage that demands attention, the cover up, the acts of obscuring or masking. These allegations of proof are all common to the defendants, not the plaintiffs. It is not the conspiracy of the defendant that is relevant on the issue of tolling the statute of limitations, it is the act of concealing the conspiracy.

_____

14. See, e.g., Abramovitz v. Ahern , 96 F.R.D. 208, 218 (D. Conn. 1982) (issue of whether fraudulent concealment would toll the statute of limitations was common to all class members); In re Plywood Antitrust Litig., 76 F.R.D. 570, 586 (E.D. La. 1976) ("fraudulent concealment issues appear to be generally common to all members in each class"); In re Sugar, 73 F.R.D. at 348; In re Fine Paper , 82 F.R.D. at 154-155 ("The key question on the issue of fraudulent concealment will relate to whether defendants successfully concealed the existence of the alleged conspiracy, and the proof of this contention [what defendants did] will necessarily be common among the class members.").

C.

Moreover, any individualized facts of fraudulent concealment may be adjudicated in the same fashion and at the same time as individual damages issues. As a leading treatise on class actions explains: "Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability." NEWBERG & CONTI, NEWBERG ON CLASS ACTIONS S 4.26 (3d ed.)

Many courts faced with similar circumstances have certified class status with the expectation that individual questions concerning fraudulent concealment can be resolved at a later damages phase. See In re Flat Glass, 191 F.R.D. at 488 (citing In re Fine Paper, 82 F.R.D. at 154-155) ("[B]ifurcation of this litigation into liability and damage segments remains an option if the predominating elements of the question of fraudulent concealment do not prove susceptible to generalized proof."). See also , In re Indus. Diamonds Antitrust Litig., 167 F.R.D. 374, 385 (S.D.N.Y. 1996) (Individualized issues raised in fraudulent concealment should be considered when court addresses each putative class member's damage claim.); Town of New Castle v. Yonkers Contracting Co., 131 F.R.D. 38, 43 (S.D.N.Y. 1990) (holding that individualized claims and defenses on statute of limitations issue can be adjudicated in separate determinations of damages).

Accordingly, we hold that common issues of fraudulent concealment predominate.

*   *   *   *   *

We have considered all contentions presented by the parties and conclude that no further discussion is necessary.

The judgment of the district court will be affirmed.

33

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

34